IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:17 CR 46-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| JORDAN HEATH OOCUMMA, | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Defendant's Motion to Suppress Evidence (# 37). The Government filed a Response to Defendant's Motion to Suppress (# 38). The undersigned conducted a hearing and heard evidence and arguments from the Government and Defendant. Having carefully considered the evidence, briefs, and arguments of counsel, the Court enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

### I.     Procedural Background

Defendant is charged with various controlled substance offenses in a six-count, multi-party bill of indictment (# 1). There are charges presented against Defendant in Counts One, Two and Five. Count One alleges during the period from August 2016, until September 2016, Defendant conspired with others to distribute

and possess with intent to distribute a quantity of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C § 841(b)(1)(A) and 21 U.S.C. § 846. Count Two alleges on August 26, 2016, Defendant knowingly and intentionally distributed methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). Finally, Count Five alleges on September 13, 2016, in Jackson County, Defendant knowingly and intentionally possessed, with intent to distribute a quantity of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

On July 17, 2017, Defendant filed his Motion to Suppress (# 37). In the Motion, Defendant moves to suppress evidence obtained by the Government from a stop and subsequent search of a vehicle Defendant was operating on September 13, 2016 (# 37). As a result, it appears Defendant's Motion is directed at Count Five of the Bill of Indictment. On July 24, 2017, the Government filed its Response to Defendant's Motion to Suppress (# 38). On August 1, 2017, the Grand Jury issued a superseding Bill of Indictment (# 39) which added additional defendants, but did not change the charges against Defendant (# 39). On August 22, 2017, the Court held a hearing on the Motion (# 37).

II. **Factual Background**

    A. **Michael Holcombe**

At the hearing, the Government called as a witness Michael Holcombe, who is a trooper with the North Carolina Highway Patrol. (T. p. 6)  Trooper Holcombe has twenty-four years of law enforcement experience (# 6).  Trooper Holcombe spent a year and a half working with the Canton Police Department, three years with the Asheville Police Department, and twenty years with the North Carolina Highway Patrol. (T. p. 6)  His duties in each of these positions included traffic law enforcement, investigation of collisions between vehicles, and operating a radar. (T. p. 7)  Generally, his duty in each venue of employment was to enforce the motor vehicle safety laws for the State of North Carolina. (T. pp. 7–8, 13)

Trooper Holcombe testified to his experience in speed detection, including making a determination of a vehicle's speed from observation and by use of radar. (T. pp. 9–10)  From his training and experience, including driver's education, Holcombe has developed the opinion that a safe traveling distance when following behind another vehicle is one car length for every ten miles per hour of speed. (T. pp. 10–12)

In the summer of 2016, Trooper Holcombe was assigned to the Criminal Interdiction Unit of the North Carolina Highway Patrol. (T. pp. 8–9)  The Criminal Interdiction Unit is a division of the Special Operations within the North Carolina Highway Patrol (# 14).  The mission of the unit is to aggressively enforce the motor vehicle statutes, apprehend wanted persons, recover stolen vehicles, and

3

aggressively enforce the controlled substance law of North Carolina. (T. p. 14) Trooper Holcombe's unit covered the area of North Carolina from Statesville, North Carolina, to the western border. (T. p. 15) The unit consisted of five troopers and a sergeant. (T. p. 15) The unit works in cooperation with other law enforcement agencies such as the DEA, SBI and other local, state and federal agencies. (T. pp. 15–16)

On September 13, 2016, at the direction of Sgt. Ray Blanton, the unit leader, Trooper Holcombe went to a meeting at the Holiday Inn located on U.S. Highway 74 in Jackson County, North Carolina. (T. pp. 16–17, 50–51) The meeting was in the evening, but was before dark. (T. p. 17) At the meeting was Agent Stites, who the Court recognizes to be Special Agent Billy Stites, a law enforcement officer for the Bureau of Indian Affairs. Agent Stites advised the troopers of persons who were the subject of a federal drug investigation. (T. p. 17) Stites gave the troopers a description of a black Toyota Camry vehicle that had been tracked to Atlanta, Georgia, that was now returning and suspected of being involved in criminal activity. (T. pp. 17–18, 59) Agent Stites told the troopers that Stites had obtained a tracking warrant and had placed a tracking device on the Toyota Camry. (T. p. 85) Stites further told the troopers if they were able to locate the vehicle and establish reasonable suspicion to stop the vehicle, it might possibly be transporting narcotics. (T. p. 18) Stites did not tell the troopers to stop the vehicle without an independent

4

reason, and Trooper Holcombe testified that he would not have done so. (T. p. 18) It was discussed that if the vehicle were found, then the troopers were to establish their own reasonable suspicion, if possible, to stop the vehicle. (T. p. 19)

After the meeting, Trooper Holcombe traveled in his patrol vehicle to a fire department located on U.S. Highway 74 in Jackson County, North Carolina, which is located in the Whittier community. (T. pp. 19–20, 50) Trooper Holcombe stopped his patrol vehicle in the parking lot of the fire department and listened to his law enforcement communications radio. (T. pp. 19–20, 50) He could hear Agent Stites communicating on the radio concerning the location of the black Toyota Camry. (T. p. 20)

U.S. Highway 74 in that area is a four-lane, divided highway. (T. p. 20) There are two lanes of eastbound travel and two lanes of westbound travel. (T. p. 20) The highway is divided by a concrete median in some locations and a grass median in other locations. (T. p. 20) There is an emergency strip on the right side of the road which is two to three feet wide. (T. p. 20) Just over the white fog line there is a rumble strip that has been cut into the emergency strip. (T. pp. 20–21) The speed limit on U.S. Highway 74 at that point is 55 miles per hour. (T. p. 21)

While Trooper Holcombe was parked, he saw a black Toyota Camry travel westbound. (T. pp. 21–22) Holcombe then drove his patrol vehicle on to U.S. Highway 74, traveling west in order to observe the black Toyota Camry. (T. p. 22)

Trooper Holcombe made a call on his radio stating to the other officers that he thought he had located the black Toyota Camry vehicle. (T. pp. 49–50)

While following the black Toyota Camry vehicle, Trooper Holcombe made a visual observation that the subject vehicle was traveling at approximately 60 miles per hour. (T. p. 23) Trooper Holcombe had radar in his vehicle but did not use it to clock the speed of the vehicle. (T. p. 48) As he traveled behind the vehicle, Trooper Holcombe observed the black Toyota Camry vehicle run across the white fog line and further saw both right side tires of the vehicle cross the fog line and travel into the emergency strip. (T. pp. 75–76) This occurred in a left-hand curve. (T. p. 23) Trooper Holcombe then observed the black Toyota vehicle approach a white pickup truck that was also traveling in the westbound lane. (T. p. 24) At one point, the Toyota Camry vehicle was traveling less than one car length behind the white pickup truck. (T. pp. 24, 57) Based upon Trooper Holcombe's training and experience, a vehicle traveling at 60 miles per hour should be traveling six car lengths behind the vehicle which it is following—one car length for every ten miles per hour of speed—in order to be traveling at a safe distance. (T. pp. 24–25, 72, 76)

After seeing the black Toyota Camry vehicle being operated in this fashion, Trooper Holcombe had concern that the operator might be under the influence of alcohol or falling asleep at the wheel. (T. pp. 25–26) Based upon what he had seen, Holcombe made a decision to stop the Toyota Camry vehicle. (T. pp. 25–26) The

Toyota Camry vehicle then exited U.S. Highway 74 and turned right onto U.S. Highway 441 traveling in the direction of Cherokee, North Carolina. (T. p. 26) Once the vehicle exited the off-ramp and traveled onto U.S. Highway 441, Trooper Holcombe activated his patrol vehicle blue light. (T. p. 26) The vehicle then made a right turn into the parking lot of the Quality Plus gas station and stopped. (T. pp. 26–27)

Trooper Holcombe testified that if he had not observed the movements and violations of traffic laws by the Toyota Camry vehicle, then he would have continued to follow the vehicle into Cherokee. (T. pp. 26, 74) If Holcombe had not observed any violation en route to Cherokee, then he would have returned to normal patrol. (T. pp. 26, 74)

After the Toyota Camry vehicle stopped in the parking lot of the Quality Plus gas station, Trooper Holcombe stopped his vehicle behind the Toyota Camry. (T. pp. 27–28) Holcombe then exited his patrol vehicle, and began to speak with Defendant, who was the operator of the Toyota Camry vehicle. (T. pp. 27–28) When Holcombe began speaking with Defendant, he immediately detected the odor of marijuana emanating from the interior of the Toyota Camry vehicle. (T. p. 28) Holcombe then searched the Toyota Camry vehicle and found an orange Nike shoe box in the back seat of the vehicle which contained 262 grams of crystal

methamphetamine and 19 grams of marijuana. (T. pp. 29–30) Trooper Holcombe also found a marijuana cigarette underneath the driver's seat. (T. p. 30)

Trooper Holcombe testified that on September 13, 2016, he had a camera system in his patrol vehicle that recorded at all times when the vehicle was being operated. (T. p. 29) When the blue lights on the patrol vehicle are activated the camera automatically backs up to the last two minutes of video that was captured and places that video on a DVD drive in the camera. (T. pp. 29, 49) The DVD containing these events was introduced into evidence by the Government. (T. pp. 30–35) (Gov. Ex. 1) The video was played in open court and has been reviewed by the undersigned on multiple occasions. (T. pp. 30–35) Trooper Holcombe testified that the quality of the video is not the best and is a two dimensional image of what occurred. (T. pp. 42–43, 76) Further, the video shows that it was completely dark when Trooper Holcombe began to follow the Toyota Camry vehicle. (Gov. Ex. 1)

The Government introduced still photographs captured from the DVD from the patrol vehicle's video camera system (T. pp. 31–33) (Gov. Ex. 2-30). On the photographs a red circle, or arrow, has been superimposed to indicate the location of the black Toyota Camry vehicle (T. p. 33). A time marker has been placed in the upper right-hand corner of each photograph (T. p. 32).

Trooper Holcombe testified that at one minute and nine seconds into the video, it shows the Toyota vehicle following the white pickup truck too closely (T.

8

pp. 38–39). Trooper Holcombe further testified he was following the Toyota Camry vehicle at approximately two hundred yards away and was traveling at a speed of 60 miles per hours. (T. pp. 39, 50, 58) Trooper Holcombe was trained that in order to determine feet traveled per second, one multiplies the miles per hour by 1.467 and the total of that calculation will be the feet per second traveled. (T. pp. 40–41, 71–72) Thus, at a speed of 60 miles per hour a vehicle is traveling 87 feet per second. The average length of a car is twelve to fifteen feet. (T. p. 61)

Trooper Holcombe issued a warning ticket to Defendant. (T. pp. 44–45) (Gov. Ex. 31) On the ticket Trooper Holcombe checked the blocks for (1) following too closely and (2) unsafe movement as being the offenses which merited the warning ticket. (T. pp. 44–45) Trooper Holcombe indicated the time of the stop as 10:00 p.m. (T. p. 45) (Gov. Ex. 31) Trooper Holcombe also issued a citation presenting criminal charges against Defendant for feloniously possessing more than 200 grams of methamphetamine and feloniously transporting methamphetamine. (Gov. Ex. 32) He further issued Defendant a citation for possessing over one-half ounce of marijuana and possession of drug paraphernalia. (T. pp. 45–56) (Gov. Ex. 33) On those two citations Trooper Holcombe indicated the speed of the Toyota Camry vehicle was "A-60" or approximately 60 miles per hour. (T. pp. 45–56, 79–80) (Gov. Ex. 32, 33)

On cross-examination Trooper Holcombe testified the video (Gov. Ex. 1) does not clearly show Defendant operating the Toyota Camry across the fog line of the highway but that he did in fact observe and <u>see</u> such an event occur. (T. pp. 48, 55, 75)  He also testified the video does not show the Toyota Camry vehicle being operated less than one car length behind the white pickup truck. (T. pp. 55–57, 75–76)  Trooper Holcombe testified that he did observe and <u>see</u> the Toyota Camry vehicle travel less than on car length the white pickup truck. (T. p. 57)

Trooper Holcombe identified North Carolina General Statute § 20-152, which reads as follows:

> (a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.
>
> (b) The driver of any motor vehicle traveling upon a highway outside of a business or residential district and following another motor vehicle shall, whenever conditions permit, leave sufficient space so that an overtaking vehicle may enter and occupy such space without danger, except that this shall not prevent a motor vehicle from overtaking and passing another motor vehicle.  This provision shall not apply to funeral processions. (T. pp. 62–64, Def. Ex. 1)

Trooper Holcombe testified that on September 13, 2016, the weather was clear and dry, the road was in good condition, the road was a four-lane divided highway, it was not a narrow two-lane road, and it had a three foot area of asphalt to the right of the fog line, along with a rumble strip.  The Toyota Camry vehicle operated by Defendant was fairly new, was in good condition, and was being operated five miles

per hour in excess of the 55 mile per hour posted speed limit. (T. pp. 63–69) Trooper Holcombe stated all of these factors could be considered in determining whether or not the Toyota Camry vehicle was following the white pickup truck more closely than was reasonable and prudent. (T. pp. 63–69) The standard of one car length per ten miles per hour of speed that was applied by Trooper Holcombe is not referenced in North Carolina General Statute § 20-152. (T. pp. 73–74) Based upon his training and experience Trooper Holcombe testified that he could determine a distance of less than fifteen feet from 600 to 800 feet away from the object of his examination. (T. pp. 87–88)

    **B.**    **Evidence of Defendant**

    1.    Yvonne Cobourn.

Yvonne Cobourn (Cobourn) has been a private investigator for four years. (T. pp. 90–103) Formally, Cobourn was a law enforcement officer employed by the Asheville Police Department for eighteen years. (T. p. 99) Cobourn was initially a patrol officer who rose through the ranks to become a detective with the Asheville Police Department. (T. p. 99) The name of her private detective agency is AEGIS Investigations. (T. p. 90) Cobourn was retained by Defendant to travel to the location of U.S. Highway 74 where Defendant's vehicle was followed by Trooper Holcombe. She was instructed to take measurements of the roadway. (T. p. 91)

Ms. Cobourn testified that she measured the area that she called the "rumble strip"—the area on the right side of the fog line up to the grass shoulder—as being 3ʹ in width. (T. p. 91)  The right-hand lane heading westbound was 12ʹ 1ʹʹ in width and the left lane heading westbound was 12ʹ 9ʹʹ in width. (T. pp. 92–98)  The dash lines located in the center line of the two westbound lanes measured 12ʹ 2ʹʹ in length and the space between the dash line measured 31ʹ in length. (T. p. 93)  The measurement of both lanes together was 25ʹ in width. (T. p. 93)  Diagrams of the measurements were introduced into evidence as Exhibits 2 and 3. (T. p. 95) (Def. Ex. 1, 2)

On cross-examination Cobourn testified that Trooper Holcombe was more experienced than she in the field of motor vehicle enforcement. (T. p. 100)

Defendant contends in his Motion to Suppress (# 37) that the stop of Toyota Camry vehicle violated the Fourth Amendment and any evidence seized during the search of his vehicle on September 13, 2016, was seized in violation of the Fourth Amendment and should be excluded from evidence.

### III. Discussion

#### A. Motion to Suppress: The Legal Standard

The Fourth Amendment of the United States Constitution provides:

Amendment IV.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

> violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

When a defendant moves to suppress evidence seized during an investigatory stop, the United States Supreme Court has held that the

> Fourth Amendment protects citizens from "unreasonable searches and seizures" by the government, and its protections extend to brief investigatory stop . . . that fall short of traditional arrest.

*United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In those situations, the Court looks to whether the actions of law enforcement are supported by a reasonable articulable suspicion that criminal activity "may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).

To determine whether an investigatory stop meets the requirements of the Fourth Amendment, the Court must "look at the "totality of the circumstances" to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (2002)). The Court's inquiry is objective rather than subjective, in that the Fourth Amendment inquiry "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," not what an officer thought or anticipated at the time. *Maryland v. Macon*,

472 U.S. 463, 470–71 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)).

In *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011), the Fourth Circuit Court of Appeals set forth the standard to be applied in determining the constitutionality of a traffic stop:

> Because a traffic stop is more analogous to an investigative detention than a custodial arrest, we treat a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).
>
> Pursuant to *Terry*, we analyze the propriety of a traffic stop on two fronts. First, we analyze whether the police officer's action was justified at its inception. Second, we analyze whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop.

*Digiovanni*, 650 F.3d at 506 (internal citations omitted) (abrogated in part on other grounds by *Rodriguez v. United States*, ____ U.S. ____, 135 S. Ct. 1609 (2015)); *see United States v. Hill*, 852 F.3d 377, 381–82 (4th Cir. 2017).

As the Fourth Circuit explained in *United States v. Hassan-el*, 5 F.3d 726, 730 (4th Cir. 1993):

> Under the objective test, if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity:
>
> When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle. . . . This otherwise valid stop does not become unreasonable merely because the officer has

14

> intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity. . . . That stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions. *Cummins*, 920 F.2d at 500–01; *see also Trigg*, 878 F.2d at 1041 ("so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." (*citing Causey*, 834 F.2d at 1184)). Such an approach minimizes inquiry into a police officer's state of mind.
>
> We adopt the objective test and likewise hold that when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment. Such a limited detention does not become "unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity." *Cummings,* 920 F.2d at 499–501 (noting that the officer testified he probably would not have stopped the car if the defendant and his passenger had not continued glancing at him and behaving suspiciously).

*Id*. at 730.

Finally, as stated by the Supreme Court in *Whren v. United States*, 517 U.S. 806, 809–10 (1996);

> The Fourth Amendment guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision. An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.

*Whren*, 517 U.S. at 809–10 (internal citations and quotations omitted).

    **B.**    **Analysis**

The facts of this case show that Trooper Holcombe's initial decision to stop the black Toyota Camry vehicle was justified. The stop was reasonable and in accordance with law. Trooper Holcombe testified he saw the Toyota Camry vehicle being operated off of the roadway of U.S. Highway 74 onto the shoulder. He further testified that he saw the vehicle being operated too closely behind a white pickup truck which was traveling in front of the black Toyota Camry vehicle.

Trooper Holcombe issued Defendant a warning ticket for unsafe movement. (T. pp. 45–46) (Gov. Ex. 31) It is a traffic violation in North Carolina to turn from a direct line if the movement cannot be made in safety. North Carolina General Statute § 20-154 provides as follows:

> The driver of any vehicle upon a highway or public vehicular area before starting, stopping or turning from a direct line shall first see that such movement can be made in safety, and if any pedestrian may be affected by such movement shall give a clearly audible signal by sounding the horn, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal as required in this section, plainly visible to the driver of such other vehicle, of the intention to make such movement. The driver of a vehicle shall not back the same unless such movement can be made in safety and without interfering with other traffic.

Trooper Holcombe testified he saw the black Toyota Camry vehicle follow a white pickup truck too closely. (T. pp. 24–25, 57, 72–76) It is a traffic violation in North Carolina to follow another vehicle too closely. North Carolina General Statute § 20-152 provides as follows:

(a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.

(b) The driver of any motor vehicle traveling upon a highway outside of a business or residential district and following another motor vehicle shall, whenever conditions permit, leave sufficient space so that an overtaking vehicle may enter and occupy such space without danger, except that this shall not prevent a motor vehicle from overtaking and passing another motor vehicle. This provision shall not apply to funeral processions.

While Trooper Holcombe admitted that neither of the violations he saw can be seen on the video (Gov. Ex. 1), he testified that he did in fact see them occur. (T. pp. 55–57, 75–76) The Court has reviewed the video on multiple occasions, both in court and privately. The video is poor quality. The video is grainy to the point that one cannot read large road signs that are on the border of the highway. In one instance, it does appear that the black Toyota Camry vehicle might have been operated to the right of the fog line and in another instance it does appear that perhaps the black Toyota Camry vehicle was operated one to two car lengths behind the white pickup truck.

A repeated review of the photographs (Gov. Ex. 2-30) by the Court neither supports nor confirms Trooper Holcombe's testimony. It is difficult to discern what, if anything, is shown in the photographs. Essentially, the photographs show lights in the dark. In any event, neither the video nor the photographs provide great support

for Trooper Holcombe's testimony. On the other hand, they do not disprove his testimony.

Trooper Holcombe's testimony is supported by his experience and training. Further support for his testimony is found on the video's sound recording. (Gov. Ex. 1) When Trooper Holcombe calls on his radio to report he is stopping the Toyota Camry vehicle, he tells the dispatchers or communications officer that he is stopping the vehicle for unsafe movement and following too closely. (Gov. Ex. 1) Additionally, on the video Trooper Holcombe clearly tells Defendant the reasons he stopped Defendant was for unsafe movement and following too closely. (Gov. Ex. 1) Giving further support, Trooper Holcombe issued of a warning ticket to Defendant for unsafe movement and following too closely. (T. pp. 44–45) (Gov. Ex. 3) Finally, the Court finds no reason to question Trooper Holcombe's testimony as not being credible.

From the evidence presented the undersigned finds Trooper Holcombe credible. Trooper Holcombe's observation of two violations of North Carolina traffic law that resulted in stopping the black Toyota Camry vehicle did not violate the Fourth Amendment. Trooper Holcombe's observation and sworn testimony provides sufficient and lawful basis for the traffic stop under North Carolina law. The only issue for the Court to resolve was if the stop of the black Toyota Camry vehicle on September 13, 2016, was in violation of the Fourth Amendment. The

Court finds the stop did not violate the Fourth Amendment and the stop satisfies the criteria of *Digiovanni* and *Hassan-el.* The undersigned will thus recommend the Motion of Defendant to suppress (# 37) be denied.

## RECOMMENDATION

**IT IS THEREFORE RESPECTFULLY RECOMMENDED that Defendant's Motion to Suppress (# 37) be DENIED.**

Signed: December 11, 2017

Dennis L. Howell
United States Magistrate Judge

## Time For Objections

The parties are hereby advised that, pursuant to 289, United States Code, Section 636(b)(1)(c), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14) days** of service of same. Responses to the objections must be filed within **fourteen (14) days** of service of the objections. Failure to file objections to this Memorandum and Recommendation with the District Court will preclude the parties from raising such objections on appeal.

*Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).